CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

02/16/2019

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Danville Division

| | | |
|---|---|---|
| LISA S., | ) | |
| Plaintiff, | ) | Civil Action No. 4:17-cv-00077 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of the | ) | By:   Joel C. Hoppe |
| Social Security Administration, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Lisa S. asks this Court to review the Acting Commissioner of Social Security's

("Commissioner") final decision denying her applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28

U.S.C. § 636(b)(1)(B). ECF No. 11. Having considered the administrative record, the parties'

briefs, and the applicable law, I cannot find that substantial evidence supports the denial of

benefits. Accordingly, I recommend that the presiding District Judge reverse the Commissioner's

decision and remand the matter for further proceedings.

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*,
858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[1] The claimant
bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden
shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In the fall of 2013, Lisa S. filed for DIB and SSI alleging that she had been unable to
work since October 16, 2011, because of carpal tunnel syndrome, fibromyalgia, spinal stenosis,
severe back pain, degenerative disc disease, arthritis, soft tissue injuries of the knee,
hypertension, major depression, and anxiety. *See* Administrative Record ("R.") 42, 94–95, 213–
18, ECF No. 9-1. Lisa S. was forty years old, or a "younger person" under the regulations, on her
alleged disability onset date. R. 94; 20 C.F.R. §§ 404.1563(c), 416.963(c). Disability
Determination Services ("DDS"), the state agency, denied her claims initially in October 2013,
R. 93–104, and upon reconsideration in April 2014, R. 105–32. On March 29, 2016, Lisa S.
appeared with counsel and testified at an administrative hearing before ALJ R. Neely Owen. *See*
R. 64–92. A vocational expert ("VE") also testified at this hearing. R. 86–91.

ALJ Owen issued an unfavorable decision on June 15, 2016. R. 42–57. He found that
Lisa S. had severe medical impairments of degenerative disc disease in the lumbar and cervical
spine, arthritis, obesity, fibromyalgia, depression, anxiety, and post-traumatic stress disorder
("PTSD"). R. 44–45. All of her other medical conditions were deemed "nonsevere" impairments
because there was "no evidence" those conditions caused "ongoing symptoms or functional
limitations for a continuous period of at least 12 months." R. 45. At step three, ALJ Owen found
that none of Lisa S.'s severe impairments met or medically equaled the relevant Listings. R. 45–

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the
date of the ALJ's written decision.

47. ALJ Owen then evaluated Lisa S.'s residual functional capacity ("RFC") and found that she could perform "light work"[2] involving "simple repetitive tasks with minimal contact with [her] coworkers and the general public." R. 47. Based on this RFC finding and the VE's testimony, ALJ Owen concluded at step five that Lisa S. was not disabled after October 2011 because she could perform certain light, unskilled occupations that offered a significant number of jobs both nationwide and in Virginia. *See* R. 56–57, 89–90. The Appeals Council declined to review the ALJ's decision, R. 14–19, and this appeal followed.

### III. Discussion

Lisa S.'s arguments on appeal challenge ALJ Owen's RFC determination, in particular the ALJ's conclusion that Lisa S.'s chronic pain was not as functionally limiting as she and three of her treating healthcare providers claimed. *See generally* Pl.'s Br. 11–21, ECF No. 14.

A claimant's RFC represents her "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis" despite her medical impairments. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted); *see* 20 C.F.R. §§ 404.1545, 416.945. It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined functionally limiting effects of impairments that are supported by the medical evidence or the claimant's credible reports of pain or other symptoms[3], *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). "This RFC

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these relatively modest strength requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

[3] The regulations set out a two-step process for ALJs to evaluate symptoms as part of the RFC determination. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. §§ 404.1529, 416.929. "First, the ALJ looks for

assessment is a holistic and fact-specific evaluation," *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017), which must reasonably account for any functional limitations the ALJ identifies at steps two or three of his decision, *see Mascio*, 780 F.3d at 638–39; *Ashcraft v. Colvin*, No. 3:13cv417, 2015 WL 9304561, at *8–10 (W.D.N.C. Dec. 21, 2015). The ALJ's written decision also must "include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in the RFC assessment, *Mascio*, 780 F.3d at 636, and explaining why he discounted any "obviously probative" evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977), that supported the individual's claim for disability benefits, *Ezzell v. Berryhill*, 688 F. App'x 199, 200 (4th Cir. 2017).

A.    *Summary*

Lisa S. claims that she was disabled during the relevant time because fibromyalgia and degenerative changes in her cervical and lumbar spine caused constant pain that severely restricted her capacities to sit, stand, walk, lift/carry, assume certain postures (e.g., bending), and complete even basic daily activities on a regular and continuing basis. *See generally* R. 72–85, 247–48, 252–55, 263–64, 301–05, 308–12. She reported to DDS that she spent her good days

---

objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability," *id.*, to work on a regular and continuing basis, *Mascio*, 780 F.3d at 637. "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects" after considering all the relevant evidence in the record. *Lewis*, 858 F.3d at 866; *see Mascio*, 780 F.3d at 639; *Hines*, 453 F.3d at 565. Once the claimant meets her "threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed," *Hines*, 453 F.3d at 565, the ALJ "will not reject" the claimant's description of her pain "solely because the objective medical evidence does not substantiate [her] statements," 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ must give specific reasons supported by "references to the evidence" for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013), and, when necessary, he should "explain how he decided which of [those] statements to believe and which to discredit," *Mascio*, 780 F.3d at 640. A reviewing court will uphold the ALJ's credibility determination so long as his articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014).

resting on the couch and sometimes doing "light" housework like dusting, watering indoor plants, or folding laundry. *See* R. 252, 254, 256–59, 300–05. She could do "little things" around the house for five or ten minutes before she had to lie down again. R. 300; *see* R. 259. Other days were "very bad" and she had to stay in bed all day. R. 252. A few times a month, Lisa S. drove to the grocery store and shopped for fifteen or twenty minutes. *See* R. 254, 260, 303. She used to cook full meals for her family, but now she could only do "something quick or something easy" that took at most ten minutes to prepare. R. 258; *see* R. 263, 302. Lisa S.'s husband, Mark, described her symptoms and limitations in similar terms. *See* R. 55, 241–49. He estimated that she could lift up to ten pounds and stand/walk for about twenty minutes before needing to rest for thirty minutes. R. 248. In March 2016, Lisa S. testified that she suffered constant, dull pain throughout her entire body. R. 72–73. Moving in certain ways caused sharp, shooting pains in her neck, back, arms, and legs. R. 72. She still spent her "good" or "fairly good" days resting on the couch in between doing "really light housework" like washing "a few dishes," folding socks, or wiping off the kitchen counters. R. 76–77. On a "really good day" she might try "a little bit of heavier housework" like sweeping or doing a load of laundry, but that usually caused incapacitating back pain the following day. R. 77. She had one or two "bad days" a week where she did not get out of bed at all. *See* R. 76–77. Lisa S. testified that she once tried to help her mother-in-law around the house after she broke her hip, but that lasted "for probably two days and then [Lisa S.] was down for three or four days" with back pain. R. 83–84. She did not help any more after that. R. 84. Lisa S. still made simple meals and drove to a nearby grocery store at least twice a month to pick up a few things. R. 78–79. She could lift at most five pounds and sit or stand in one place for about ten minutes. R. 83.

Lisa S. received all of her routine healthcare from Earle Moore, M.D., Randall Suslick, M.D., and Thelma Pealer, ANP, at Chase City Family Practice. Their pertinent findings on physical examinations (if any) were mostly normal, except that Lisa S. consistently endorsed "tenderness" in her cervical and lumbar spine on exams after February 2014. R. 401–04, 504–06, 509–11, 512–15, 518–20, 548–51, 552–54, 555–57, 558–61, 565–67; *see also* R. 393, 471–72, 499–501, 502–03, 507–08, 516–17, 562–64 (no relevant findings on exam). Dr. Moore and NP Pealer prescribed various combinations of Celebrex, Mobic (meloxicam), Vicodin (hydrocodone-acetaminophen), and/or Neurontin (gabapentin) for pain, and Lisa S. often reported that these medications worked well enough, R. 510, 555, for her to "maintain [her] normal level of functioning," R. 547. *See also* R. 410, 504–05, 507, 509–11, 552–53, 562, 566–67, 574–76. In August 2013, Dr. Moore opined that Lisa S.'s fibromyalgia, brachial neuritis, degenerative disc disease, and spinal stenosis had prevented her from "performing any type of gainful activity, in a competitive work environment for 8 hours a day, 5 days per week" since at least October 2011. R. 490 (Ex. 5F).

Several treatment notes document objective abnormalities related to Lisa S.'s painful musculoskeletal impairments. On August 7, 2012, Lisa S. complained of stiff joints with pain in her hands, and Dr. Moore noted "tenderness" in both wrists and "swelling" in two fingers on the right hand. R. 413–14. Laboratory tests for rheumatoid arthritis were normal. R. 410, 463. Three days later, Lisa S. reported feeling "much better" after starting meloxicam. R. 410. In February 2013, NP Pealer switched her to Celebrex after she reported that the meloxicam was not "working as well as it used to" in controlling her fibromyalgia pain. R. 401–03. Lisa S. also reported pain and tingling in her upper extremities during visits with NP Pealer in October 2015 and March 2016. R. 548–51, 574–76. NP Pealer noted decreased (4/5) grip strength bilaterally in

7

October, R. 549, and generalized "muscle weakness" in both arms the following March, R. 575.

On June 13, 2013, Lisa S. reported intermittent severe, sharp pain in her neck radiating into her left shoulder for the past week. R. 396. Lisa S. appeared "uncomfortable," endorsed "tenderness" to palpation of the cervical paraspinal muscles and upper trapezius muscle, and was "unable to move [her] neck" in any direction. R. 397. Her reflexes, sensation, and straight-leg-raising tests were normal. *Id.* NP Pealer administered a medrol injection and instructed Lisa S. to return as needed. *Id.* X-rays of Lisa S.'s cervical spine taken on July 1 showed degenerative disc disease with "probable" foraminal narrowing at C5-C6. R. 462; *see* R. 392. Dr. Moore diagnosed brachial neuritis, "chronic, not controlled"; instructed Lisa S. to continue taking Celebrex and Vicodin as prescribed; and noted that they would "get a cervical spine MRI as soon as she [got] insurance for financial assistance." R. 392–93. An MRI taken on February 10, 2014, showed central disc bulges causing "moderately severe canal narrowing at C5-C6 and mild central canal narrowing at C6-C7," moderate to severe foraminal narrowing at C5-C6, and some "spurring on the right at C4-C5." R. 518. Dr. Suslick recommended that she see a neurosurgeon, but Lisa S. said she had to wait until she had insurance. R. 522; *see* R. 519, 574. A second MRI taken in April 2016 showed multilevel degenerative disc disease with "mild to moderate" spinal canal narrowing and "mild" formina narrowing at C2-C3 to C4-C5 and C6-C7, but "moderate to severe spinal canal narrowing at C5-C6" with "[d]eformity of the ventral cord from further enlargement of a central disc protrusion with succession of mild cord compression," R. 597–98.

Lisa S. often complained of lower back pain and sciatica when she saw Dr. Moore or NP Pealer. *See* R. 503, 504–05, 507, 509–10, 512–13, 516–17, 518, 521, 545–47, 548, 552–53, 555–56, 558, 565, 574–82. She exhibited "abnormal" range of motion in the lumbar spine on March 17, 2016. R. 575. Her gait was almost always "normal," *id.*, except on November 20, 2015, when

she exhibited a "slight limp on [the] left knee," R. 546, and again on March 17, 2016, when she had an "abnormal" gait and "decreased muscle tone" with generalized "muscle weakness" in the lower extremities, R. 575. The MRI taken on February 10, 2014, showed "mild progression of disc desiccation" at L3-L4 and L4-L5 with "new mild anterior listhesis of L4 over L5 (grade 1)" and "new ligamental flava and facet hypertrophy contributing to the mild to moderate spinal canal narrowing" at that level. R. 518. A follow-up X-ray and MRI in April 2016 showed "minimal degenerative disc disease [at] L3-L4 and L4-L5" with "severe facet arthrosis" and "considerable facet sclerosis" at L4-L5, R. 600, as well as progressive "bilateral facet arthropathy at L5-S1 with fluid signal present in both facet joints," R. 598.

     Between February and July 2015, Lisa S. rated her back pain as "5-6/10" on exam, and explained that the "lowest it goes [is] to 2/10 [when] sitting and 3-4/10 when moving around." R. 504, 552, 555, 565. In February, March, and June, she also reported that she accompanied her husband "a time or two" when he made "some trips [for] his job" driving a large truck, but she had to double her daily dose of Celebrex because these trips were "hard on her back." R. 504, 555, 565. On July 27, 2015, Lisa S. told NP Pealer that she had "been very busy taking care of family members since her mother in law broke her hip" and that the Celebrex helped "some" with her back pain. R. 552. She did not say what exactly she did for her family members or how long she had been doing this. *See* R. 83–84. The administrative record contains a progress note dated February 9, 2016, showing that a person named Lisa S. told NP Pealer she was "taking care of her mother and that is a little difficult." R. 569 (Ex. 10F, at 1). However, the Lisa S. mentioned in that record has a different middle name, date of birth, and patient identification number than the claimant-plaintiff in this case. *Compare* R. 569–73 (Ex. 10F), *with* R. 395–440, 504–68, 574–77, *and* 583 (Ex. 2F, 8F, 9F, 11F, 13F). Additionally, this Lisa S. reported in June

2013 that both of her parents were deceased. R. 396.

The record contains several medical opinions about Lisa S.'s physical impairments and related functional limitations. *See* R. 98–101 (DDS, Oct. 2013); R. 112–19, 125–28 (DDS, Apr. 2014); R. 491–98 (Dr. Moore, Oct. 2013); R. 578–83 (Dr. Suslick & NP Pealer, Mar. 2016). The DDS physicians concluded that Lisa S.'s discogenic and degenerative back disorder was a severe medical impairment, but that her diagnosed fibromyalgia was a nonsevere impairment. R. 98, 112, 125. In October 2013, Carolina Bacani-Longa, M.D., opined that Lisa S. could occasionally lift/carry twenty pounds and frequently lift/carry ten pounds; use her arms or legs to push/pull without limitation, up to the weights and frequencies for lift/carry; sit and stand and/or walk for about six hours during an eight-hour workday; and engage in postural activities without limitation. R. 100–01. She did not explain how or why she reached this conclusion. *See id.* Lewis Singer, M.D., affirmed Dr. Bancai-Longa's opinion after reviewing Lisa S.'s updated medical records available through December 2013. *See* R. 108–31. Dr. Singer's RFC explanation consists of two partial citations to the medical record:

> 12/19/13 exam for Rx refills, no pain complaints, only pain med Celebrex.
> 10/15/13 exam to fill out forms, no pain complaints, only pain med Celebrex.

R. 114–15, 127–28 (punctuation corrected). Dr. Singer also mentioned Dr. Moore's August 2013 opinion that Lisa S. had been "disabled" since October 2011, but he did not mention the physician's more detailed medical opinion produced in October 2013. *See* R. 108–31.

On October 15, 2013, Lisa S. went to Dr. Moore's office "to help fill out a form for disability." R. 502 (Ex. 7F); *see* R. 491–98 (Ex. 6F). Dr. Moore did not document any abnormal findings on that date's physical exam, R. 502–03, but he did note that Lisa S.'s chronic arthropathy and lower back pain were "not controlled" by Celebrex and Vicodin, R. 502–03; *see* R. 493, 495. Lisa S. described this pain as a constant tingling sensation and dull ache that

radiated into her legs. *See* R. 492. She also had constant dull neck pain, which Dr. Moore related

to degenerative disc disease with foraminal narrowing at C5-C6. *See* R. 491–92. Her pain

fluctuated between "mild" and "severe," *see* R. 493, but it was always "severe enough" to

interfere with her attention and concentration, R. 496. Dr. Moore opined that, during an eight-

hour workday, Lisa S. could sit and stand/walk for at most one hour, but also needed to stand up

and move around every five or ten minutes; lift/carry up to ten pounds; had "moderate" to

"marked" limitations using both upper extremities; could not do any job that involved keeping

her "neck in a constant position"; needed to take an unscheduled five-minute break every five to

ten minutes; and could never push, pull, kneel, bend, or stoop. R. 493–97. He considered Lisa

S.'s symptoms and functional limitations to be "reasonably consistent" with her diagnosed

medical conditions at this time, R. 492, and noted that they could have been present since 2006,

R. 497.

In March 2016, Dr. Suslick and NP Pealer completed a "Disability Impairment

Questionnaire" and wrote a letter supporting Lisa S.'s claims. R. 578–82, 583 (Exs. 12F, 13F).

Much like Dr. Moore, Dr. Suslick and NP Pealer opined that Lisa S. could lift/carry at most ten

pounds; sit and stand/walk for less than one hour each during an eight-hour workday, but also

needed to stand up and move around every ten minutes; never "bend, twist[,] make sudden

movements[,] or do anything requiring exertion"; and would need "several" unscheduled,

indeterminate rest breaks every hour. R. 580–81, 583. These functional limitations applied as far

back as October 16, 2011. R. 582. Dr. Suslick and NP Pealer further explained that it was "very

likely" Lisa S. needed "surgery to relieve pressure on nerves from bulging discs in [her] cervical

spine and possibly [her] lumbar spine," R. 578, and that her already debilitating chronic neck and

back pain, muscle weakness, and other symptoms likely would "progress without intervention,"

11

R. 583. Lisa S. was going to see a neurosurgeon later that spring. R. 84–85, 578, 582–83.

B.      *The ALJ's Decision*

ALJ Owen considered Lisa S.'s medical impairments and alleged functional limitations

throughout his written decision. *See* R. 44–55. At step two, he found that her arthritis,

fibromyalgia, and degenerative disc disease of the lumbar and cervical spine were "severe"

medical impairments because they "cause[d] significant limitations" in her ability to perform

"basic work activities," R. 44–45, which, according to the regulations include physical functions

like "walking, standing, sitting, [and] lifting," 20 C.F.R. §§ 404.1521(b)(1), 416.921(b)(1). He

concluded at step three that Lisa S.'s medical record contained no objective evidence suggesting

that "the combined clinical findings from" her severe physical impairments, including

fibromyalgia, met or medically equaled the severity of any listed impairment. R. 45–46.

ALJ Owen then found that Lisa S. could perform the full range of "light work" without

any restrictions on her postural or manipulative capacities. *See* R. 47, 51, 52–54, 56. His RFC

assessment included a detailed discussion of Lisa S.'s statements to DDS and hearing testimony,

R. 48–50, 55, and a fairly thorough summary of the medical evidence related to her impairments

and alleged limitations, R. 50–55. He found that Lisa S.'s impairments could reasonably be

expected to cause the essentially disabling symptoms that she and her husband described, but

that their statements were "not entirely consistent with the medical evidence and other evidence

in the record for the reasons explained in [the] decision," R. 50. *See* R. 50–51, 55. Although ALJ

Owen did not clearly identify specific reasons for discounting Lisa S.'s statements, he repeatedly

referred to the "routine" or "conservative" nature of her treatment and the "limited clinical

findings" or "few abnormal[ities]" on physical examinations in explaining why the "record as a

whole" did not support Lisa S.'s and her treating providers' allegations that she had pain-related

12

limitations far more extreme than those ALJ Owen included in the RFC for light work. *See* R.
50, 51–52, 53, 54, 55.

ALJ Owen's summary of the medical record opened with his conclusion that Lisa S. "has
degenerative disc disease of the lumbar and cervical spine, fibromyalgia, obesity, and arthritis,
which imposes a light work level (Exhibits 5F, 8F, 12F). However, the medical evidence of
record demonstrates limited findings on examinations and conservative treatment." [4] R. 50. He
then discussed the February 2014 MRI of Lisa S.'s cervical and lumbar spine showing "mild" to
"moderate" degenerative changes at C5-C6 to C6-C7 and L3-L4 to L4-L5, R. 50 (citing Ex. 8F),
as well as progress notes showing that her exams were usually normal and that she sometimes
reported that prescription medications provided enough pain relief that she could "function" and
"perform her daily activities," *see* R. 50, 54 (citing Exs. 2F, 8F–11F). He also acknowledged a
few "exceptions" to this pattern, including that Lisa S.'s physical examinations "typically
reflect[ed] neck and lumbar spine tenderness" and she "had an abnormal gait and lumbar range
of motion on examination in March 2016." R. 50 (citing Exs. 8F–11F). ALJ Owen did not
mention the April 2016 cervical/lumbar MRI showing "moderate to severe spinal canal
narrowing at C5-C6" with new evidence of a "deformity of the ventral cord from further
enlargement of a central disc protrusion with succession of mild cord compression" and "severe
facet" arthrosis and sclerosis at L4-L5 with new evidence of progressive "bilateral facet
arthropathy at L5-S1 with fluid signal present in both facet joints." *See* R. 597–600.

As for the nature of her medical treatment, ALJ Owen found that Lisa S. had received

---

[4] Exhibit 5F is Dr. Moore's August 2013 opinion that Lisa S.'s fibromyalgia, brachial neuritis,
degenerative disc disease, and spinal stenosis had prevented her from "performing any type of gainful
activity in a competitive work environment for 8 hours a day, 5 days per week" since at least October
2011. R. 490; *see* R. 52–53. Exhibit 12F is the "Disability Impairment Questionnaire" that Dr. Suslick
and NP Pealer completed in March 2016 indicating that Lisa S. could lift/carry at most ten pounds and sit
and stand/walk for at most one hour each during a normal eight-hour workday. R. 578–82; *see* R. 53–54.

"medications and chiropractic treatment," R. 50, but there were "no records of operative [or

surgical] reports [from] the relevant period," R. 45. He did not mention Dr. Suslick's and NP

Pealer's March 2016 opinions that Lisa S. "very likely" needed "surgery to relieve pressure on

nerves from bulging discs in [her] cervical spine and possibly [her] lumbar spine," R. 578, and

that her already debilitating chronic neck and back pain, muscle weakness, and other symptoms

would likely "progress without intervention," R. 583. *See* R. 53–54.

ALJ Owen then considered Lisa S.'s self-reported activities of daily living. R. 51; *see* R.

48–50. He recognized that Lisa S. had consistently described "fairly limited" daily activities after

she applied for benefits, but he concluded there were "other factors" that counseled against

"considering these allegations to be strong evidence" that she was "disabled":

> First, allegedly limited daily activities cannot be objectively verified with any
> reasonable degree of certainty. Second[], even if the claimant's daily activities are
> truly as limited as alleged, it is difficult to attribute that degree of limitation to the
> claimant's medical condition, as opposed to other reasons, in view of the
> relatively weak medical evidence and other factors discussed in [the ALJ's]
> decision. Overall, the claimant's reported limited daily activities are considered to
> be outweighed by the other factors discussed in [the] decision.

R. 51. ALJ Owen cited three examples from the record that purportedly undermined Lisa S.'s

testimony and other statements made in support of her disability claims:

> [T]he claimant alleges that she is unable to do yard work; however the record
> reflects that the claimant was bit by a snake while weeding in tall grass in July
> 2013 (Exhibit 3F). She also . . . reportedly does very little during the day;
> however, the record notes numerous times that she has gone on trips with her
> husband for his work when he drives, and she reportedly takes more medication
> on those days due to increased pain in her back with riding in the truck. (Exhibits
> 8F, 9F). The record also reflects that the claimant has taken care of family
> members (Exhibits 9F, 10F). Although the claimant alleges she did this for only
> two days when her mother-in-law fractured her hip, the evidence of record
> mentions such activities on at least two different occasions months apart (Exhibits
> 9F, 10F).

R. 52 (spelling and grammar corrected).

Finally, ALJ Owen gave "great weight" to the DDS physicians' identical opinions that

14

Lisa S. "can lift/carry/push/pull 20 pounds occasionally and ten pounds frequently; can

stand/walk about six hours in an eight-hour workday; and can sit about six hours in an eight-hour

workday" because he found those opinions to be "consistent with the record as a whole, which

reflect[ed] limited clinical findings and routine conservative treatment." R. 52. Conversely, he

gave "little weight" to the three treating providers' opinions because he found their "extreme"

restrictions on her physical capacities to be inconsistent with the "limited clinical findings and

routine conservative treatment" reflected in the providers' own progress notes. R. 53–54. He also

noted Dr. Moore's "internally inconsistent" opinion might have been "based on [Lisa S.'s]

subjective complaints . . . as opposed to the objective medical evidence," R. 53 (citing R. 502),

while Dr. Suslick and NP Pealer's opinions conflicted with Lisa S.'s own reports "that her

medications allowed her to function and perform her daily activities," R. 54 (citing Ex. 11F).

*C.    Analysis*

        "A necessary predicate to engaging in substantial evidence review is a record of the basis

for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found

credible and why, and specific application of the pertinent legal requirements to the record

evidence." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (internal citation omitted). The

ALJ does not need to discuss every piece of relevant evidence, but he "must evaluate the record

fairly," *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (per curiam), and provide

enough "analysis of the evidence to allow the [reviewing] court to trace the path of his

reasoning," *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). *See Lewis*, 858 F.3d at 869;

*Mascio*, 780 F.3d at 636–38; *Hines*, 453 F.3d at 566 (citing *Diaz*, 55 F.3d at 307). Similarly, it is

not enough for the ALJ to simply summarize the relevant evidence if he then fails to explain how

he resolved material ambiguities or conflicts in the record and why the credited evidence

supports his findings and conclusions. *See Woods v. Berryhill*, 888 F.3d 686, 695 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176, 191 (4th Cir. 2016). In other words, the "ALJ's failure to 'build an accurate and logical bridge from the evidence to his conclusion'" that the claimant is not disabled typically "constitutes reversible error." *Lewis*, 858 F.3d at 868 (quoting *Monroe*, 826 F.3d at 189). ALJ Owen's written decision does not meet these minimum standards.

First, too "[m]uch of the ALJ's RFC assessment was devoted to summary" and not enough to logical, accurate analysis. *Lacek v. Colvin*, Civ. Action No. CBD-13-2046, 2014 WL 2865992, at *8 (D. Md. June 23, 2014); *see also Thomas v. Berryhill*, No. 17-2215, 2019 WL 193948, at *3 (4th Cir. Jan. 15, 2019) ("[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion. The second component, the ALJ's logical explanation, is just as important as the other two."). ALJ Owen concluded that Lisa S. could perform light work without any additional restrictions "and summarized evidence that he found credible, useful, and consistent." *Woods*, 888 F.3d at 694. "But the ALJ never explained how he concluded—*based on this evidence*—that [Lisa S.] could actually perform the tasks required by [light] work," *id.*, such as lifting/carrying up to twenty pounds at a time, and sitting or standing/walking for six hours throughout an eight-hour workday, *Neal*, 2010 WL 1759582, at *2. *See* R. 47, 50–56. Instead, he summarily adopted the opinions of the two DDS physicians— neither of whom cited any meaningful support for their functional assessments or had the benefit of reviewing any of the diagnostic images or treating-source medical evidence created after September 2013—without fully explaining why those opinions were most "consistent with the record as a whole," R. 52. *See Woods*, 888 F.3d at 694–95; *Monroe*, 826 F.3d at 191. "As such, the analysis is incomplete and precludes meaningful review." *Monroe*, 826 F.3d at 191.

Second, ALJ Owen did not explain how he weighed obviously probative evidence that conflicted with his stated reasons for finding Lisa S.'s chronic pain and functional limitations were not as debilitating as she and her doctors alleged. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 764 (W.D. Va. 2002) ("A district court will no[t] . . . revisit the ALJ's resolution of conflicting evidence. However, if the ALJ appears, without stating a reason, to have credited some probative evidence over other evidence or to have ignored evidence altogether, a remand or reversal may be necessary."). For example, because he did not mention the April 2016 MRI, he did not explain how that objective medical evidence of "severe" degenerative changes with spinal cord involvement and "deformity of the ventral cord from further enlargement of a central disc protrusion," R. 597–98; *see* R. 578–83, factored into his conclusion that the "record as a whole" reflected "limited clinical findings," R. 51, 52, 54. Similarly, while ALJ Owen reasonably found that Lisa S.'s treatment focused on prescription pain medications rather than surgery, R. 45, 50, he did not acknowledge that Dr. Suslick and NP Pealer thought it was "very likely" she would need "surgery to relieve pressure on nerves from bulging discs in [her] cervical spine and possibly [her] lumbar spine," R. 578, and that her already debilitating chronic pain would only "progress without intervention," R. 583. *Cf. Golembiewski*, 322 F.3d at 917 (explaining that "it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence" when it appears he "ignore[d] an entire line of evidence that is contrary to the ruling"). Nor did he recognize Lisa S.'s consistent statements, made in response to those providers' repeated advice that she go see a neurosurgeon, that she could not afford to pay out of pocket for specialized treatment. R. 519, 522, 574. *See Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) ("A claimant may not be penalized for failing to seek treatment she cannot afford."); *cf. Dunn v. Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015) (finding no error in

17

the ALJ's reliance on the "conservative" nature of claimant's prescribed treatment because there was no "suggestion that [she] required more aggressive treatment yet received conservative treatment for other reasons").

Third, ALJ Owen's reliance on the "routine" or "conservative" nature of Lisa S.'s treatment and the "limited clinical findings" or "few abnormal[ities]" on physical examinations presents a special problem for the RFC assessment in fibromyalgia cases, like this one, because such evidence is an inherently unreliable way to gauge the intensity, persistence, or functionally limiting effects of a fibromyalgia patient's allegedly disabling musculoskeletal pain. *See Knight v. Comm'r, Soc. Sec. Admin.*, Civ. No. SAG-16-2515, 2017 WL 3088365, at *2 (D. Md. July 20, 2017); *Ellis v. Colvin*, No. 5:13cv43, 2014 WL 2862703, at *8–12 (W.D. Va. June 24, 2014). Fibromyalgia "is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012). "Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). Indeed, the patient's "physical examinations will usually yield normal results," including full range of motion, no joint swelling, normal muscle strength, and intact neurological reactions. *Green-Younger v. Barnhart*, 335 F.3d 99, 108–09 (2d Cir. 2003). Additionally, "[c]hronic, incurable conditions such as fibromyalgia are customarily managed by 'conservative' measures such as medications" because "more intensive treatment options" like surgery simply do not exist. *Knight*, 2017 WL 3088365, at *2 (citing *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010)). Thus, many federal courts have "appropriately viewed with skepticism" ALJ decisions that rely on such evidence in order to discredit a claimant's or treating physician's statements describing the severity and functionally limiting

18

effects of an individual claimant's fibromyalgia pain. *See, e.g.*, *id.*; *Ellis*, 2014 WL 2862703, at

*8–11 (collecting cases). Because ALJ Owen did not explain why this evidence undermined Lisa

S.'s and Dr. Moore's statements describing the role fibromyalgia pain, in particular, played in

her "extreme" alleged physical limitations, R. 50–53, I cannot conclude that these reasons

provide substantial support to discount those statements. *Ellis*, 2014 WL 2862703, at *8–12

(reversing and remanding where the ALJ failed to explain how the lack of objective findings in

treatment notes, the routine and conservative nature of prescribed treatment, and the claimant's

modest daily activities logically undermined a treating physician's opinion and the claimant's

statements describing debilitating fibromyalgia pain).

Finally, substantial evidence in the record does not support ALJ Owen's rationale for

why Lisa S.'s minimal daily activities were not a reliable gauge of the intensity, persistence, and

functionally limiting effects of her chronic pain. The ALJ's assertion that "allegedly limited daily

activities cannot be objectively verified with any reasonable degree of certainty," R. 51, is a non-

starter, which likely explains why the Commissioner did not mention it in her argument. *See*

*generally* Def.'s Br. 9–10, 12–14, ECF No. 17. "What the ALJ meant exactly by 'cannot be

objectively verified with any reasonable degree of certainty' is not completely clear; further, how

an ALJ would 'verify' a [claimant's] daily activities is equally unclear." *Kendle v. Colvin*, No.

3:16cv27, 2016 WL 7337147, at *20 (N.D. W. Va. Nov. 30, 2016), *adopted by* 2016 WL

7335638 (N.D. W. Va. Dec. 16, 2016). More importantly, Lisa S. was not required to

"objectively verify" the nature or scope of her daily activities. *Id.* at *21. Having met the

"threshold obligation of showing by objective medical evidence a condition reasonably likely to

cause the pain claimed, [Lisa S.] was entitled to rely exclusively on subjective evidence to prove

. . . that [her] pain is so continuous and/or so severe that it prevents [her] from working a full

19

eight hour day." *Hines*, 453 F.3d at 565 (footnotes omitted). ALJ Owen recognized Lisa S.

testified that she did "very little during the day," R. 51, but he simply refused to believe that her

activities were as limited as she claimed. *Kendle*, 2016 WL 7337147, at *21.

Although ALJ Owen cited a few examples from the record that he believed "outweighed"

Lisa S.'s testimony, those examples do not provide substantial support for his flawed credibility

determination. First, the February 2016 clinic note that ALJ Owen cited to contradict Lisa S.'s

testimony that she only helped her mother-in-law for two days after she broke her hip, may not

belong to the plaintiff-claimant in this case. R. 52–53 (citing Ex. 10F). It appears to belong to

one of NP Pealer's patients with the same first and last name as this Lisa S., but a different

middle name, date of birth, and medical chart identification number. *Compare* R. 569–73 (Ex.

10F), *with* R. 395–440, 504–68, 574–77, *and* 583 (Ex. 2F, 8F, 9F, 11F, 13F). Thus, Lisa S.'s

testimony on that point is undisputed on this record, and cannot independently support ALJ

Owen's adverse credibility determination. *Hines*, 453 F.3d at 566 ("The deference accorded an

ALJ's findings of fact does not mean that we credit even those findings contradicted by

undisputed evidence.").  Second, the rest of the ALJ's explanation why "other factors" outweigh

Lisa S.'s compelling testimony seizes on isolated or "insignificant inconsistencies in the

treatment record while overlooking the record's broader import." *Testamark v. Berryhill*, 736 F.

App'x 395, 399 (4th Cir. 2018). For example, although Lisa S. pulled some weeds from tall grass

(i.e., did "yard work") one time in the summer of 2013, ALJ Owen doid not explain how that

isolated aberration is inconsistent with Lisa S.'s otherwise consistent descriptions of her

extremely limited daily activities. R. 51. Similarly, the fact that Lisa S. accompanied her husband

as a passenger "a time or two" when he made "some trips [for] his job" driving a large truck, but

had to double her daily dose of Celebrex because these trips were "hard on her back," R. 504,

555, 565, is not necessarily inconsistent with her and her doctors' allegations that she can sit for only a few minutes at a time. *See Hines*, 453 F.3d at 565 ("This conclusion was not supported by substantial evidence because the record, when read as a whole, reveals no inconsistency between the two.").

\* \* \*

The Court takes no position on whether Lisa S. should be awarded disability benefits. Rather, the issue "here arises from a problem that has become all too common among [ALJ] decisions challenged in this court—a problem [agency] decision makers could avoid" if they would just "show [their] work." *Patterson*, 846 F.3d at 663 (capitalization altered). ALJ Owen's written analysis in this case was so conclusory, and at points materially incomplete, that I am "left guess about how the ALJ arrived at his conclusions" on Lisa S.'s ability to perform work-related functions on a sustained basis. *Mascio*, 780 F.3d at 637. Thus, "because [I] cannot gauge the propriety of the ALJ's RFC assessment, [I] cannot say that substantial evidence supports the [Commissioner's] denial of benefits." *Patterson*, 846 F.3d at 662. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record, explain how any material inconsistencies or ambiguities were resolved at each critical stage of the disability determination process, and provide an accurate, logical description of how specific evidence in the record supports each conclusion in the RFC assessment.

### IV. Conclusion

For the foregoing reasons, I cannot find that substantial evidence supports the Commissioner's denial of benefits in this case. Accordingly, I respectfully recommend that the presiding District Judge **GRANT** the Plaintiff's motion for summary judgment, ECF No. 13, **DENY** the Commissioner's motion for summary judgment, ECF No. 16, **REVERSE** the

Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. §

405(g), and **DISMISS** the case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and
Recommendation], any party may serve and file written objections to such
proposed findings and recommendations as provided by rules of court. A judge of
the court shall make a de novo determination of those portions of the report or
specified proposed findings or recommendations to which objection is made. A
judge of the court may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge. The judge may also receive
further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United

States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of

record.

ENTER: February 15, 2019

Joel C. Hoppe
United States Magistrate Judge